3ə

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AMY MEMMINGER,

Plaintiff,

Case: 2:26-cv-11230
Assigned To : Michelson, Laurie J.
Referral Judge: Patti, Anthony P.
Assign. Date: 4/13/2026
MEMMINGER V. HAMTRAMCK, CITY OF,  et al. (CMP)(CMC)

-vs

**JURY TRIAL
DEMANDED**

CITY OF HAMTRAMCK; Officer BENJAMIN
WRIGHT, a Hamtramck Police Officer, in his
individual capacity; Officer ADELAJDA
SHEHU, a Hamtramck Police Officer, in her
individual capacity; Officer CHRISTOPHER
FEY, a Hamtramck Police Officer, in his
serndpety@gmail.com
individual capacity; JACQUELINE WYSONG,
a Hamtramck Police Officer, in her individual
capacity;  EUGENE TETREAULT , a
Hamtramck Police Officer, in his individual
capacity; Police Chief ANN MOISE, in her
Individual capacity; jointly and severally.

AMY MEMMINGER
*Pro Se Plaintiff*
1095 Evaline St.
Hamtramck MI, 48212
313.623.3500

DEFENDANTS                                          PLAINTIFF

_____

## COMPLAINT

NOW COMES Plaintiff, *pro se*, with the following against the above-captioned

Defendants:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This is a federal civil rights action in which the Plaintiff seeks relief and damages for the violation of rights secured by the United States Constitution under the Fourth, and Fourteenth Amendments, 42 U.S.C. §§ 1983 and 1988, the Rehabilitation Act, and the Americans with Disabilities Act. The Plaintiff's claims arise from the Defendants' use of excessive force, failure to provide appropriate medical care, invasion of privacy, and the refusal to provide reasonable accommodations for the Plaintiff's disabilities during a traffic stop and subsequent booking procedure, including the forced administration of a chemical breath test. Venue is proper in the United States District Court for the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b), because the Defendants reside within this district and all acts and omissions giving rise to these claims occurred within this judicial district.

## INTRODUCTION

2. Plaintiff Amy Memminger is a resident of Wayne County, Michigan. At all times relevant to this action, Plaintiff was a qualified individual with disabilities under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, suffering from Post-Traumatic Stress Disorder (PTSD), Generalized Anxiety Disorder (GAD), and Major Depressive Disorder (MDD).

3. During a traffic stop and subsequent booking process conducted by the

Hamtramck Police Department, Plaintiff was denied reasonable accommodations for her disabilities. While experiencing a severe psychiatric episode, Plaintiff was forced to undergo a chemical breath test, denied necessary medical care while engaging in self-harm, placed in a restraint chair without necessary checks, and denied access to phone calls, an advocate, hospital care, and basic privacy. These actions were taken by officers acting under color of state law, in violation of the Plaintiff's Fourth and Fourteenth Amendment rights.

4. The constitutional violations suffered by the Plaintiff were not an isolated occurrence, but were the direct result of a persistent and widespread custom of misconduct within the Hamtramck Police Department. The City of Hamtramck had actual and constructive notice of a history of its officers physically and otherwise abusing persons in their custody. These documented incidents include, but are not limited to:

a) *Sudul v. City of Hamtramck, 221 Mich. App. 455 (1997)* (Excessive Force)

b) *Mays v. City of Hamtramck,* Case No: 2:2016-cv-13882 (Ed. Mich. 2016)  (Excessive force and Punitive Escalation);

c) *Wassel v. City of Hamtramck*, Case No. 4:18-cv-11662 (E.D. Mich. 2018) (Culture of bias and unlawful detentions);

d) *Gobah v. City of Hamtramck*, Case No. 2:21-cv-11828 (E.D. Mich. 2021) (Excessive force and medical neglect);

e) *United States v. McInerney*, Case No. 2:20-cr-20353 (E.D. Mich. 2021)

3

(Excessive force and falsifying police reports) [1]

f) *Garbarino v. City of Hamtramck*, Case No. 2:25-cv-13844 (E.D. Mich. 2025) (Systemic corruption, destroying evidence, and impaired driving by the Police Chief).[2]

5. Despite this clear pattern of misconduct, the City of Hamtramck acted with deliberate indifference by failing to train, supervise, or discipline its officers regarding the constitutional rights of detainees and the requirements of the Americans with Disabilities Act.

6. This established culture of impunity was the moving force behind the excessive force, deliberate indifference, and medical neglect the Plaintiff experienced.

7. During the initial traffic stop, the Plaintiff gave clear notice of her PTSD. During the booking process and following her admission to the Hamtramck jail, Hamtramck police officers were placed on notice multiple times that Plaintiff was experiencing an acute mental health emergency and required immediate intervention from a mental health professional or hospital admittance. Despite these repeated requests, Defendants acted with deliberate indifference and objective unreasonableness by disregarding the Plaintiff's serious medical

---

[1] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Former Michigan Police Officer Sentenced to Three Years for Using Unreasonable Excessive Force During an Arrest (Sept. 9, 2021), https://www.justice.gov/archives/opa/pr/former-michigan-police-officer-sentenced-three-years-using-unreasonable-excessive-force **(See Exhibit A)**

[2] See Steve Neavling, *Whistleblowers sue Hamtramck, alleging corruption and retaliation*, Detroit Metro Times (June 2, 2025), available at https://www.metrotimes.com/news/whistleblowers-sue-hamtramck-alleging-corruption-and-retaliation-39567549/." **(See Exhibit A)**

needs. This failure to provide care caused the Plaintiff to suffer a seizure, engage in self-harm, have multiple panic attacks, vomit, and disassociate. Rather than providing medical stabilization, Defendants punished the Plaintiff for her medical symptoms by treating her as a physical threat and subjecting her to a restraint chair, which constituted excessive force and a violation of her 14th Amendment rights.

8. The aforementioned unconstitutional conduct could and should have been prevented by Defendant City of Hamtramck through the implementation of proper training, policies, and supervision regarding disability accommodations and mental health crises. The City's failure to provide such oversight was the proximate cause of the violations of Plaintiff's rights. Accordingly, Defendants should be enjoined from engaging in or permitting such conduct in the future. Furthermore, Plaintiff is entitled to compensatory and punitive damages for the physical injuries, psychiatric trauma, and extreme emotional distress caused by Defendants' actions.

## STATEMENT OF FACTS

9. On April 25, 2023, Plaintiff was at a soccer match at Keyworth Stadium in Hamtramck in the evening. Plaintiff saw her alleged stalker, sexual assaulter, and abuser in the stadium, and began having PTSD symptoms. Recognizing the danger, she waited for her abuser to leave and walked back to her car with a group of friends. Plaintiff and friends entered a nearby bar across from her car, The Painted Lady, where Plaintiff and friends were going to use the restroom.

5

Plaintiff immediately notices her abuser, the former city clerk of Hamtramck, and the city assessor in the bar. Plaintiff admitted to a friend she was afraid. Plaintiff and friends waited for the abuser to leave and Plaintiff admittedly drove home the one mile, rather than walked, out of fear.

10. According to the FOIA obtained video, Plaintiff was pulled over by Officer Benjamin Wright, less than two minutes after driving. Plaintiff pulled over, parallel parked, and began to look for documents. When PO Wright approached the vehicle, he asked if the car was hers, Plaintiff said no. Plaintiff admits that she was confused, scared, and trying to mask her symptoms while suffering an episode. PO Wright asked Plaintiff if she had anything to drink at the stadium, and she admitted to two Long Drinks while at the stadium. PO Wright asked her to get out of the vehicle. PO Wright informed Plaintiff that she was pulled over for driving over the yellow line and into the opposite lane. Plaintiff experienced acute cognitive disorientation, a documented symptom of her PTSD, which resulted in confusion regarding the shifting traffic lines, recently painted,  on Jos Campau. This disorientation was a direct physiological response to the trauma triggers encountered minutes prior at the stadium and bar. Plaintiff then recognizes PO Wright as the officer that had arrested her in 2019. PO Wright denies knowing the Plaintiff.[3]

---

[3] In June of 2019,PO Benjamin Wright and other Hamtramck unknown officers, arrested Plaintiff for OWI, while sitting in her vehicle across the street from her house. Plaintiff was listening to music with her seatback reclined and eyes closed. Plaintiff reported to officers that she had an Anxiety Disorder and could not do the tests they required. Officers insisted on the tests. Plaintiff was taken into custody and suffered a PTSD and panic episode while in custody. EMS was

11. Several other officers arrived including PO Fey, PO Shehu, and PO Tetreault. Wright instructed Plaintiff to do a roadside sobriety test and asked several questions about limitations. Plaintiff disclosed her disabilities, PTSD[4] and Plantar Fasciitis, and requested the deactivation of the flashing strobe lights as a reasonable medical accommodation. While PO Wright initially complied by deactivating his vehicle's lights, the arriving officers failed to coordinate this accommodation. Multiple additional police vehicles remained on-scene with active flashing lights directed at the Plaintiff. This collective failure to maintain a medically necessary environment directly contributed to the Plaintiff's escalating neurological distress and sensory overload during the roadside encounter. PO Wright proceeded with the roadside test. Upon failing roadside tests, and a preliminary breath test, Plaintiff was taken into custody. PO Tetreault, made a sarcastic statement upon PO Shehu's placement of Plaintiff in the vehicle, "Not a crime at all huh?".

12. Plaintiff was taken into the booking room and sat on a bench by PO Fey and PO Shehu. According to the provided video, at 10:12, PO Fey asked Plaintiff if she had any medical conditions and if she was taking medication. Plaintiff explicitly informed PO Fey and PO Shehu of her PTSD diagnosis and her use of Cymbalta and Xanax. This provided the Department with actual

called and the female technician put officers on notice that Plaintiff should not be in custody, that she had PTSD. Officers refused admittance to the hospital or access to a mental health professional. Plaintiff provided documentation of her mental health disabilities to the Honorable Judge Krot and City Attorney Clark. **(SEE EXHIBIT B)**
[4] **(SEE EXHIBIT B)**

notice of a qualifying disability under the ADA before any medical crisis began.

13. At approximately 14:26, Plaintiff begins to show signs of a PTSD episode. Plaintiff focused on her alleged abuser, at 15:11, she admitted to PO Fey and PO Shehu that she has been stalked, harassed and abused for seven years. At 15:58, she admitted to being sexually assaulted by the same abuser. Plaintiff repeated several questions, and repeated ideas. At 17:55, PO Fey attributed Plaintiff's perseverative speech, a documented clinical symptom of a PTSD episode, to intoxication, revealing a dismissive bias and a failure to recognize an approaching medical crisis. [5]

---

[5] The Plaintiff's repetitive verbalizations and persistent focus on the individual(s) responsible for the trauma are characteristic of 'perseveration' and 'trauma-related rumination.' Clinical research identifies these as involuntary cognitive symptoms of Post-Traumatic Stress Disorder (PTSD) where the brain's executive functioning is temporarily impaired by high physiological arousal, resulting in a 'compulsion to repeat' or a 'fragmented' narrative. These episodes represent an objective physiological response to a perceived current threat rather than a voluntary behavioral choice.(SEE EXHIBIT C)

Brewin, C. R. (2016). Coherence, disorganization, and fragmentation in traumatic memory reconsidered: A response to Rubin et al. (2016). *Journal of Abnormal Psychology*, *125*(7), 1011–1017. https://doi.org/10.1037/abn0000154; https://discovery.ucl.ac.uk/id/eprint/1524713/1/Brewin_Revised%2520manuscript%2520accepted.pdf Cited by: 114

van der Kolk, B. A. (1989). The Compulsion to Repeat the Trauma. *Psychiatric Clinics of North America*, *12*(2), 389–411. https://centrodocumentacion.psicosocial.net/wp-content/uploads/2004/01/vanderkolk-compulsion-to-repeat.pdf Cited by: 1575

Watkins, E. R. (2008). Constructive and unconstructive repetitive thought. *Psychological Bulletin*, *134*(2), 163–206. https://doi.org/10.1037/0033-2909.134.2.163 Cited by: 3652

Wiedemann, M., Janecka, M., Wild, J., Warnock-Parkes, E., Stott, R., Grey, N.,

14. At 19:05, PO Benjamin Wright enters the room and Plaintiff asks him if he knows that her abuser raped her. PO Wright quickly leaves the room. At 23:06 Plaintiff begins screaming about the rape and the abuser. PO Fey says "You are reading too much into this... I am listening to you, the problem I am having is you are not listening to me." Plaintiff complies and completes the first breath test.

15. Plaintiff then recounted the 2019 arrest and broke down[6]. Plaintiff says "You have no idea what they did to me." PO Fey says "I can only imagine. This department has gone through a large change in the last calendar year". Plaintiff began hyperventilating and crying at 25:37. Plaintiff was gasping for air, had rapid breathing and was screaming "Help me put him in jail, I can't take this anymore". Plaintiff then recounts years of abuse. Plaintiff said "You are going to hurt me, he is going to hurt me". PO Shehu responded to Plaintiff's expressions of terror with sarcasm, "No one is going to hurt you", further demonstrating a reckless disregard for the Plaintiff's psychological state and a failure to provide a trauma-informed environment.

---

Clark, D. M., & Ehlers, A. (2023). Changes in cognitive processes and coping strategies precede changes in symptoms during cognitive therapy for posttraumatic stress disorder. *Behaviour Research and Therapy, 169*, 104407. https://doi.org/10.1016/j.brat.2023.104407 Cited by: 9

[6] While in Hamtramck PD custody in 2019, several police officers allegedly routinely passed by Plaintiff's holding cell using her abusers name. PO Wright and other unknown officers, allegedly said things like, August knows you are here, August warned you, August called on the phone. Prior to being placed in the cell, officers were dispatched to Whiskey in the Jar and then arrived with another detainee that had been arrested at the bar where her abuser was working that night.

16. PO Fey and PO Shehu then told Plaintiff to come back to the machine. Plaintiff complies, but then indicated that she has PTSD and cannot breathe, at 27:55. Plaintiff then screams "This is not a joke" and folded over unable to breathe.[7] PO Fey and PO Shehu did nothing except tell the Plaintiff to take deep breaths and stand back up. At 28:55, PO Shehu continued to push for the second test, followed by PO Fey doing the same. Despite Plaintiff's visible air hunger and repeated declarations of "I can't breathe," Officers Fey and Shehu prioritized the collection of a breath sample over the Plaintiff's immediate

---

[7] The physical manifestation of airway constriction and respiratory fatigue during PTSD arousal is a well-documented physiological phenomenon. Research indicates that psychologically triggers CNS-mediated vagal excitation, leading to involuntary bronchoconstriction and smooth muscle contraction in the bronchial passages (Ritz et al., 2019). This condition, often characterized by "air hunger" (dyspnea), can escalate into life-threatening respiratory failure or asthma when the metabolic drive to breathe exceeds the physical capacity of the constricted airway (Worsham et al., 2021); . Clinical studies further confirm that chronic hyperarousal in trauma survivors results in systemic inflammation and "objective airflow limitation," placing the individual at a significantly higher risk for near-fatal respiratory events and physical exhaustion (Spitzer et al., 2010;). **(SEE EXHIBIT D)**

Ritz, T. (2012). Citation: Ritz, T. (2012). Airway responsiveness to psychological processes in asthma and health. *Frontiers in Physiology*, *3*, 343. Read on Frontiers Cited by: 142

Worsham, C. M., Banzett, R. B., & Schwartzstein, R. M. (2021). Dyspnea, acute respiratory failure, psychological trauma, and post-ICU mental health: a caution and a call for research. *Chest*, *159*(2), 749-756. https://journal.chestnet.org/article/S0012-3692(20)34844-3/fulltext Cited by: 65

Spitzer, C., Koch, B., Grabe, H. J., Ewert, R., Barnow, S., Felix, S. B., Ittermann, T., Obst, A., Völzke, H., Gläser, S., & Schäper, C. (2010). Association of airflow limitation with trauma exposure and post-traumatic stress disorder. *European Respiratory Journal*, *37*(5), 1068–1075. https://doi.org/10.1183/09031936.00028010 Cited by: 78

medical stability, violating the Department's duty of care.

17. At 28:33, Plaintiff collapsed on the floor in a state of dissociative despair, repeating "Please help me" over and over, a clear indicator of perseveration. Rather than summoning medical aid for a collapsed prisoner, PO Shehu admonished the Plaintiff, stating, "You are not listening!" [8] This demonstrates a total failure to distinguish between willful non-compliance and a disability-related medical emergency. PO Fey said to get up and go back to the bench. PO Fey then threatened to pick up Plaintiff and return her to the bench if she didn't get up. At 29:17, PO Fey and PO Shehu picked up Plaintiff and returned her to the bench.

18. While Plaintiff was being carried back to the bench, she told PO Fey and PO Shehu that she had PTSD and she could not do the things they were asking her to do. Plaintiff then rapidly repeated, "I can't" and "help me". PO Fey repeated to Plaintiff that if she refused to take the test, she would lose her license. PO Fey said "if your level of intoxication is too high for your cooperation, your license is going to be suspended for one calendar year." PO Wright was listening and was seen on camera in the hallway and did nothing at 29:44. PO Fey then spoke with PO Wright and said he was waiting for her level of intoxication and needed one good blow.

---

[8] The failure of law enforcement to distinguish between symptoms of a psychiatric disability and criminal non-compliance is a well-recognized basis for liability under Title II of the Americans with Disabilities Act. See *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998); *City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015)."

19. Plaintiff spent over a minute repeating the same phrase "Please help me". PO Shehu said you are going to lose your license. At 31:07, Plaintiff reached out her arm towards PO Shehu indicating a need for help standing. PO Shehu then collected Plaintiff and brought her to the machine. Plaintiff tried to do the test again and failed, then was prompted to try again. At 32:08, Plaintiff was still struggling to breathe and did the test again, with success.

20. PO Fey yelled aloud. Officer I was able to get a second sample. Upon obtaining the second sample through coercion during a medical crisis, PO Wright remarked, "Outstanding… You the best." This celebration of a test obtained during a documented neurological collapse underscores the Department's prioritizing of evidence collection over the life and safety of a disabled resident. Plaintiff was then fingerprinted and taken to the holding cell without incident.

21. The bodycam video of PO Shehu ends at 55:37 with Plaintiff having asked to use the phone and PO Shehu said the phones are broken, they haven't worked in months. [9]

22. The following facts were derived from the holding cell video, without sound, received from The City of Hamtramck through the Freedom of Information Act.

23. Plaintiff spent just ten minutes in the holding cell, and at 10:43, began to

---

[9] Due to Plaintiff being unable to notify anyone of her detention, her Service Dog in Training was left alone and ate a toy. As a result, her Service Dog in Training was hospitalized for several days and had to have emergency life-saving surgery. **(SEE EXHIBIT B)**

bang repeatedly on the door of the cell. At 13:54 she spoke to an officer and asked for the phone to call her lawyer and requested an ADA advocate. She was denied access. Plaintiff continued to bang on the door and to ask for a phone call, an advocate, a lawyer and the hospital for the next 30 minutes.

24. At 38:18, Plaintiff used the restroom in plain view of a camera. Defendants further violated Title II of the ADA by failing to provide a reasonable accommodation regarding the Plaintiff's known history of sexual assault and resulting PTSD. Despite being put on actual notice of the Plaintiff's status as a survivor of sexual trauma, Defendants required the Plaintiff to perform private bodily functions under the live surveillance of male officers.

25. Plaintiff is not sure about the exact time, but while pounding on the door, a female officer approached the door and asked "So how do you get PTSD, were you in a war or something?" This interaction establishes that the Department had actual notice of the Plaintiff's disability prior to the subsequent medical emergency.

26. At approximately 1:37:04, Plaintiff began exhibiting autonomic arousal, including labored breathing and perseverative movements. At 1:42:03 Plaintiff began to rock back and forth while sitting. At 1:47:20 Plaintiff continued to exhibit autonomic arousal, labored breathing, and perseverative movements.

27. At 1:55:19, Plaintiff rolled over and placed her head upside down, screaming for help while in a state of air hunger.

28. At 1:58:03, Plaintiff may have suffered a dissociative seizure and collapsed,

13

remaining unresponsive on the floor of the cell for about 3:07 seconds. [10]

Plaintiff remained in physical distress for over six minutes without any officer intervention.

29. At 2:01:00, Plaintiff got up from the floor and banged on the door again. Plaintiff used the restroom and while still struggling to breathe.

30. At 2:03:43, Following the cumulative 20-minute period of visible respiratory distress and a subsequent loss of consciousness, the Plaintiff was finally provided with her prescribed inhaler. This late-stage intervention serves as an admission by the Department that a medical necessity existed. However, the failure to provide this accommodation during the initial 15-minute escalation, despite the Plaintiff's manifest struggle for breath, constitutes a deliberate and harmful delay in medical care.

---

[10] The Plaintiff may have experienced a psychogenic non-epileptic seizure (PNES), a documented physical manifestation of PTSD often triggered by extreme psychological distress and confinement. Clinical research identifies PNES as an involuntary dissociative response to trauma, distinct from epilepsy but equally debilitating. The failure to provide medical intervention or a trauma-informed environment during this episode constitutes a disregard for a known serious medical need. **(SEE EXHIBIT E)**

Cleveland Clinic. (2025). Psychogenic Nonepileptic Seizures (PNES):
https://my.clevelandclinic.org/health/diseases/24517-psychogenic-nonepileptic-seizure-pnes
van der Kolk, B. A. (2014). *The Body Keeps the Score.* (Explains how trauma is 'stored' in the body and expressed through physical symptoms like seizures).
Metzner, J. L., & Fellner, J. (2010). *Solitary confinement and mental illness.* Journal of the American Academy of Psychiatry and the Law. https://jaapl.org/content/38/1/104. Cited by 400+

31. During the 3:07 period of unconsciousness, no medical assistance was summoned, and no officers entered to assess Plaintiff's airway or vitals. [11]

32. At 2:19:17, Plaintiff began clutching her heart, then dry heaving, and vomiting.

34. Plaintiff is unsure about the time, but was approached through the doorway by PO Wright asking for a signature for her vehicle's impound and forfeiture. Plaintiff could not respond. PO Wright marked the form as refused. PO Wright reprimanded Plaintiff, claiming she was ignoring him. [12]

35. At 2:26:27, while in a state of documented dissociative self-harm, Plaintiff used components of a non-functional phone to injure herself. Despite the officers' later admission that "they could see everything," they allowed the Plaintiff to continue injuring herself for approximately 20 minutes before intervening. This constitutes a failure to protect a vulnerable detainee.

36. At 2:44:30, the cell door is opened and Plaintiff is told to come to the hallway. Male officers were present. She was ushered into a restraint chair, and restrained by belts on her arms and legs. One officer said, didn't the Plaintiff know they could see everything I was doing in there? At 2:45:46, she was wheeled back into the cell. Due to Plaintiff's level of trauma, she could not

---

[11] Under Mich. Admin. Code R. 791.735, holding cells in Michigan jails or lockups must be designed for unobstructed supervision, and if electronic cameras are used for this purpose, they must be continuously monitored from an officer's duty station that is staffed 24 hours a day to ensure safety and security.

[12] **(SEE EXHIBIT G)**

remember the faces of the officers. Officer Wysong[13], the supervisor in charge, signed off on the restraint chair's usage.

37. At 2:50:18, a female EMS technician arrived in the cell. At 2:50:52, the female EMS attempted to look at the wound on Plaintiff's hand, but was unable due to the restraints. PO Fey and Shehu then entered the cell and PO Fey released the restraint on the wounded arm.

38. At 2:51:18, a male EMS technician entered the cell. When Plaintiff reiterated her diagnoses of PTSD, GAD, and MDD, PO Fey falsely claimed he had not been informed, despite the Plaintiff's explicit disclosure during booking hours prior. The female EMS technician observed the Plaintiff's state and stated, "She should not be here," indicating that the jail was an inappropriate and medically unsafe environment for a person in the Plaintiff's condition.

39. At 2:54:28, Officer Shehu enters the cell. Simultaneously, Officer Wright addressed the room from the hall in an annoyed and accusatory tone, claiming that the Plaintiff had been "ignoring" him previously, but was now capable of speaking to the female EMS technician.

40. Officer Wright's statements demonstrate a reckless disregard for the Plaintiff's clinical state; he misinterpreted a period of documented unresponsiveness and dissociative shock as willful non-compliance. This bias, attributing disability-related symptoms to intentional defiance, was a primary factor in the delay of the Plaintiff's medical care.

---

[13] **(SEE EXHIBIT G)**

41. After multiple attempts to get Plaintiff's blood pressure, EMS instructs officers to take off Plaintiff's coat. Plaintiff was visibly stimming and rocking and could not stay still. At 2:53:54, The male EMS, took a fingerprick blood sample. Plaintiff was later informed she was tested for drugs and opiates and came back negative.

42. At 2:56:52, Plaintiff's head was facing the ceiling and she was rocking in the chair, clearly in psychological pain.

43. At 3:03:34, EMS finally was able to get a blood pressure reading, and gave Plaintiff her inhaler again. Plaintiff immediately vomited.

44. At 3:04:15, EMS leaves.

45. At 3:04:26, PO Fey and PO Shehu return Plaintiff to restraints.

46. Plaintiff was placed again in a four-point restraints. Despite her manifest psychological pain and ongoing episode, she was left unmonitored from 3:05:05 until 3:47:57, over 40 minutes, with no vital checks, which is a violation of standard correctional medical protocols for restrained individuals.[14]

47. At 3:47:57, Officer Fey and Officer Shehu return to the cell and release the Plaintiff from restraints. Plaintiff is hugging herself, and immediately goes to the restroom.

---

[14] Mich. Admin. Code R. 330.7243(2) & (9):
"(2) A recipient who is in restraint or seclusion shall be inspected at least once every 15 minutes by designated personnel." "(9) For restrained recipients, a provider shall ensure that an assessment of the circulation status of restrained limbs is conducted and documented at 15-minute intervals or more often if medically indicated."

48. At 4:03:42, Plaintiff covers her head with her coat.

49. At 4:20:48, Plaintiff resumed vomiting and continued to vomit until 8:39:13, with no medical intervention.

50. Sometime during the night, Plaintiff was told that her mother was called to verify her diagnosis and ask for medication. The Department's decision to call the Plaintiff's mother to verify her diagnosis, rather than accepting the Plaintiff's own medical disclosure or contacting her healthcare provider, demonstrates a paternalistic and discriminatory bias, treating a disabled adult resident as lacking credibility regarding her own medical needs.

51. At 9:03:34, Plaintiff is released to her mother. [15]

## PARTIES

52. Plaintiff AMY MEMMINGER is a natural person and a resident of the City of Hamtramck, County of Wayne, State of Michigan. At all times relevant to

---

[15] After the Plaintiff's detention, Plaintiff formally reported her abuser to the Hamtramck Police Department (HPD); although the allegations were found credible and warrants were requested for Criminal Sexual Conduct (CSC) 3rd Degree and Felony Stalking, the Wayne County Prosecutor's office denied requests in 2024 for further investigation, and again in August 2025 for more evidence after the HPD resubmitted severed counts. During this period, Officers Wright and Wysong were involved in a May 2025 incident involving the Plaintiff and her abuser that resulted in a formal complaint of disability discrimination, and in February 2026, Plaintiff filed a formal administrative grievance against the Officer in Charge, Detective Jon Daughtry, alleging disability discrimination and retaliation in the handling of the investigation and the prioritization of the suspect's political connections over the Plaintiff's safety as a disabled resident. After the closure of the complaints, HPD pursued a new stalking charge against Plaintiff's abuser in April 2026. At this time, HPD and The City of Hamtramck denied FOIA, seeking those officers' discipline records. **(SEE EXHIBIT F)**

this action, Plaintiff was a "qualified individual with a disability" as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102, and the Rehabilitation Act.

53. Defendant CITY OF HAMTRAMCK is a municipal corporation organized under the laws of the State of Michigan. The City is responsible for the operation, policies, and training of the Hamtramck Police Department (HPD). The City is a "public entity" subject to the mandates of Title II of the ADA.

54. Defendant OFFICER BENJAMIN WRIGHT was, at all times relevant, a police officer employed by the HPD. He is sued in his individual capacity. At all times, he acted under color of state law.

55. Defendant OFFICER CHRISTOPHER FEY was, at all times relevant, a police officer employed by the HPD. He is sued in his individual capacity. At all times, he acted under color of state law.

56. Defendant OFFICER ADELAJDA SHEHU was, at all times relevant, a police officer employed by the HPD. She is sued in his individual capacity. At all times, she acted under color of state law.

57. Defendant OFFICER JACQUELINE WYSONG was, at all times relevant, a police officer employed by the HPD. She is sued in his individual capacity. At all times, she acted under color of state law.

58. Defendant EUGENE TETREAULT , was, at all times relevant, a police officer employed by the HPD. She is sued in his individual capacity. At all times, she acted under color of state law.

59. Defendant CHIEF ANNE MOISE was, at all times relevant to this Complaint, the Chief of Police for the City of Hamtramck Police Department and the final policymaker for the detention facility and its staff. Chief Moise is sued in her individual and official capacities. She was responsible for the implementation of policies, the training of custodial staff, and the supervision of all personnel who interacted with the Plaintiff during her time in custody.

## COUNT I: 42 U.S.C. § 1983 – 14th AMENDMENT

**Deliberate Indifference to Serious Medical Needs *(Against All Individual Defendants)***

60. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

61. At all times relevant, Plaintiff was a pretrial detainee in the custody of the Hamtramck Police Department, entitled to protection against "deliberate indifference" to her serious medical needs under the Due Process Clause of the Fourteenth Amendment.

62. Plaintiff's medical needs were objectively serious, manifesting as acute respiratory distress, air hunger, involuntary muscle posturing, and a documented three-minute and seven-second (3:07) loss of consciousness following a dissociative seizure.

63. Defendants Wright, Fey, and Shehu had actual subjective knowledge of the Plaintiff's serious medical needs. This knowledge is evidenced by:

　　a) Plaintiff's explicit disclosure of her PTSD diagnosis and medications during booking (Para. 12);

20

    b) The female officer's inquiries regarding the origin of Plaintiff's PTSD (Para. 25);

    c) The clear, unobstructed view of the Plaintiff's 20-minute physical struggle and subsequent collapse provided by the digital surveillance system.

64. Despite this knowledge, Defendants acted with deliberate indifference by:

    a) Failing to summon emergency medical services (EMS) for over an hour while the Plaintiff was in manifest physical distress;

    b) Withholding the Plaintiff's prescribed life-saving inhaler until after she had suffered a seizure and lost consciousness;

    c) Prioritizing the administrative collection of a breath sample over the Plaintiff's basic physiological stability.

65. The Defendants' failure to provide timely medical intervention was not a result of mere negligence, but represented a reckless disregard for the Plaintiff's life and safety.

66. As a direct and proximate result of the Defendants' unconstitutional conduct, Plaintiff suffered severe physical injury, including respiratory trauma and self-inflicted wounds, as well as profound and permanent emotional distress.

**COUNT II: TITLE II OF THE AMERICANS WITH DISABILITIES ACT**

**Failure to Accommodate and Disability Discrimination** *(Against Defendant City of Hamtramck)*

21

67. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

68. At all times relevant, Plaintiff was a "qualified individual with a disability" (PTSD, GAD, MDD, and Plantar Fasciitis)[16] which substantially limits one or more major life activities, including breathing, neurological function, and the ability to care for oneself.

69. Defendant City of Hamtramck is a public entity subject to the mandates of Title II of the ADA, 42 U.S.C. § 12132, which prohibits the exclusion of a disabled person from participation in, or the denial of benefits of, the services, programs, or activities of a public entity.

70. Defendants violated the ADA by failing to provide reasonable accommodations during the Plaintiff's arrest and detention, including but not limited to:

    a) Failing to coordinate the deactivation of strobe police lighting despite Plaintiff's explicit request and the high risk of neurological triggering (Para. 10-11);

    b) Failing to provide a trauma-informed environment for a survivor of sexual assault by requiring the Plaintiff to perform bodily functions under male surveillance (Para. 26);

    c) Insisting on the completion of a motor-function and respiratory-based breathalyzer test while the Plaintiff was in a state of manifest clinical collapse (Para. 16-19).

---

[16] **(SEE EXHIBIT G)**

71. Defendants further discriminated against the Plaintiff by utilizing discriminatory methods of administration that disregarded her ability to comply with police commands. Specifically, Defendants misinterpreted the Plaintiff's disability-related symptoms (perseverative speech and air hunger) as "intoxication" or non-compliance (Para. 12-19).

72. The bias exhibited by HPD officers, specifically the dismissive questioning regarding the origin of Plaintiff's PTSD (Para. 25) and the sarcastic dismissal of her terror (Para. 15)—constitutes intentional discrimination and a failure to train officers on the basic requirements of the ADA.

73. As a result of these failures, Plaintiff was denied the benefit of a safe, non-discriminatory detention and suffered a foreseeable and preventable neurological collapse and physical injury.

## COUNT III: 42 U.S.C. § 1983 – 14th AMENDMENT

**Violation of the Right to Privacy and Bodily Integrity** *(Against All Individual Defendants)*

74. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

75. As a pretrial detainee, Plaintiff retained a constitutionally protected interest in her bodily privacy and the right to be free from unnecessary and degrading exposure of her person during private bodily functions.

76. Defendants Fey, Shehu, Wright, Tetreault, and Wysong  violated this right by subjecting the Plaintiff to continuous live surveillance by male officers while she utilized the restroom (Para. 26).

23

77. This intrusion was objectively unreasonable because:

   a) Defendants had actual notice of the Plaintiff's history of sexual assault and the resulting PTSD (Para. 13-14), making the psychological impact of male surveillance foreseeable and severe;

   b) The Department possessed the technological means to mask or black box the toilet area on live monitors, as evidenced by the redactions in the recorded FOIA footage, but failed to utilize these privacy measures during the Plaintiff's actual detention;

   c) There is no legitimate penological interest justified, forcing a non-violent, medically distressed female survivor of sexual trauma to be viewed by male officers while exposed.

78. By allowing male officers to monitor the feed, admitted by the officers assisting in restraining Plaintiff, and the Restraint Chair Log, Defendants intentionally subjected the Plaintiff to unnecessary humiliation and retraumatization.

79. As a direct and proximate result of this invasion of privacy, Plaintiff suffered an escalation of her PTSD symptoms, including the air hunger and dissociative collapse documented in the following minutes of the recording.

**COUNT IV:, 42 U.S.C. § 1983, MUNICIPAL MONELL CLAIM**

*(Against the City of Hamtramck, Wayne County)*

80. The Fourth Amendment prohibition against unreasonable searches and seizures, and the Fourteenth Amendment Due Process Clause, forbid police

officers from imposing excessive physical force or exhibiting deliberate indifference to a serious medical need, including the punitive use of a restraint chair while a citizen was in a known medical crisis.

81. Defendant CITY OF HAMTRAMCK, turned a blind eye to these officers' actions or omissions creating an atmosphere, policy, and custom of widespread practice or deliberate indifference to fester, thereby attaching liability under the Monell Doctrine. The permitted customs, practices, and/or policies which were the moving force behind, and resulted in, the violations of Plaintiff's constitutional rights complained of herein.

82. These customs, practices, and/or policies included, but were not limited to, the following:

a) Failing to adequately train and/or supervise its police officers so as to prevent violations of citizens' constitutional rights; *Sudul v. City of Hamtramck, 221 Mich. App. 455 (1997)*

b) Failing to adequately train and/or supervise police officers regarding the proper use of force; *Mays v. City of Hamtramck, Case No: 2:16-cv-13881 (Ed. Mich. 2016); Gobah v. City of Hamtramck, Case No. 2:21-cv-11828 (E.D. Mich. 2021); United States v. McInerney, Case No. 2:20-cr-20353 (E.D. Mich. 2021).*

c) Failing to adequately supervise, review, and/or discipline police officers whom Defendant CITY OF HAMTRAMCK knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or

encouraging its police officers to engage in illegal conduct; *Wassel v. City of Hamtramck* (E.D. Mich. 2018), Case No. 4:18-cv-11662; *United States v. McInerney*, Case No. 2:20-cr-20353 (E.D. Mich. 2021)

d) Failing to adequately train and/or supervise its police officers in the proper policies and procedures to recognize a citizen in a medical crisis and instruction for proper medical care, *Mays v. City of Hamtramck,* Case No: 2:16-cv-13881 (Ed. Mich. 2016)

e) Failing to adequately train and/or supervise its police officers, as well as employees of the City and its school district in the proper policies and procedures of a citizen with a disability in need of accommodations; *Y.A. v. Hamtramck Public Schools, et al.*, No. 24-1855 (6th Cir. 2025).

f) Maintaining a de facto custom or practice of utilizing mechanical restraints and high-level force as a punitive measure against non-compliant or medically incapacitated detainees, rather than for legitimate safety or medical purposes, *Mays v. City of Hamtramck,* Case No: 2:16-cv-13881 (Ed. Mich. 2016).

83. The City of Hamtramck had actual or constructive notice of these deficiencies through prior complaints, internal reports, litigation culture of the department, and the treatment of detainees within the City Hall jail, *Wassel v. City of Hamtramck*, Case No. 4:18-cv-11662 (E.D. Mich. 2018); *Garbarino v. City of Hamtramck*, Case No. 2:25-cv-13844 (E.D. Mich. 2025); yet failed to

take corrective action.

    a) The federal conviction of Officer Ryan McInerney (2021) for excessive force and falsifying reports, demonstrating a lack of adequate supervision and a culture of cover-ups.

    b) The 2025 investigative report by Miller Johnson Attorneys[17], which detailed a 'culture of misconduct' and 'poor judgment' by high-ranking City Hall and Police officials that prioritized political protection over constitutional compliance.

    c) Defendant CITY OF HAMTRAMCK has been on notice of continual and repetitive violations of the same constitutional protections by its officers for decades. This historical pattern of misconduct is evidenced by litigation dating as far back as *Sudul v. City of Hamtramck, 221 Mich. App. 455 (1997)*, which established that the City could be held liable for the excessive force used by its officers if such force was part of a governmental custom or policy.

84. Defendants' conduct was so egregious that an objectively reasonable officer would have paused and considered other options, such as medical intervention or psychiatric accommodation, rather than exacerbating a known disability and medical crisis.

85. Defendants' acts, omissions, and deliberate indifference were the direct and

---

[17] City of Hamtramck, Hamtramck Investigation Report (Aug. 24, 2025), https://www.google.com/search?q=https://go.boarddocs.com/mi/cohmi/Board.nsf/files/DKXL4A54B213/$file/Hamtramck%20Investigation%20Report%20-%20August%2024%2C%202025.pdf.

proximate cause of Plaintiff's physical injury, extreme emotional distress, and constitutional deprivations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amy Memminger respectfully requests that this Court enter judgment in her favor and against Defendants, granting the following relief:

    a.  Compensatory Damages in an amount to be determined at trial for physical injury, pain and suffering, and permanent emotional distress.

    b.  Punitive Damages against the Individual Defendants for their reckless disregard and bias.

    c.  Declaratory Relief stating that the Defendants' actions violated the ADA and the U.S. Constitution;

    d.  An Order requiring the City of Hamtramck to implement mandatory ADA and trauma-informed training for all HPD officers;

    e.  Plaintiff requests compensatory and punitive damages in an amount to be determined by a jury at trial, but in no event less than $750,000, plus interest, costs, and reasonable attorney's fees under 42 U.S.C. § 1988 and the ADA.

## INDEX OF EXHIBITS TO COMPLAINT

| | |
|---|---|
| EXHIBIT A | News Articles Related to Hamtramck Civil Rights Cases |
| EXHIBIT B | First Notice of Disability, Medical Diagnosis, Service Dog |
| EXHIBIT C | Research Related to Traumatic Memory and Repetition |
| EXHIBIT D | Research Related to Lung Function and PTSD |
| EXHIBIT E | Research Related to Psychogenic Nonepileptic Seizure (PNES) |
| EXHIBIT F | MDCR Complaints and FOIA Denials |
| EXHIBIT G | Time Stamps of FOIA videos provided by City of Hamtramck and Restraint Chair Log |

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Amy Memminger

Executed on this __/3__ day of __April__, 2026.

Respectfully submitted,

Amy Memminger, *Plaintiff Pro Se*
1945 Evaline Street,
Hamtramck MI, 48212
313.623.3500
serndpety@gmail.com

29

## VERIFICATION

I, Amy Memminger, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned action, that I have read the foregoing Complaint, and that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Amy Memminger

Executed on this _13_ day of _April_, 2026.

## PRO SE FILER

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Amy Memminger

Executed on this _13_ day of _April_, 2026.

## CERTIFICATE OF COMPLIANCE REGARDING GENERATIVE AI

Pursuant to the Court's Standing Order, Plaintiff *pro se* hereby certifies that she utilized a Generative AI tool (Gemini) to assist in the formatting, editing, and structural organization of this Complaint. Plaintiff further certifies that every legal citation and factual assertion contained in this filing has been manually verified for accuracy and authenticity.

Amy Memminger

Executed on this _13_ day of _April_, 2026.

30

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Amy Memminger

## DEFENDANTS
City of Hamtramck; Benjamin Wright; Adelajda Shehu; Christopher Fey; Jacqueline Wysong; Eugene Tetreault; Anne Moise

**(b)** County of Residence of First Listed Plaintiff    Wayne County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Wayne County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se, Amy Memminger, 1945 Evaline St. Hamtramck, MI 48212
313-623-3500

Attorneys *(If Known)*
Odey Meroueh

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability    ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &    Pharmaceutical Slander    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability    ☐ 368 Asbestos Personal ☐ 340 Marine    Injury Product ☐ 345 Marine Product    Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability    **PERSONAL PROPERTY** ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | **LABOR** ☐ 710 Fair Labor Standards | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability    ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury    ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -    Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations    ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | | 26 USC 7609 | Act/Review or Appeal of |
| | Employment    **Other:** | **IMMIGRATION** | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | Other    ☐ 550 Civil Rights | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 448 Education    ☐ 555 Prison Condition | Actions | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983; 42 U.S.C. § 12132
Brief description of cause: Civil rights action under the 14th Amendment and ADA Title II failure to accommodate during arrest and detention.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?          ☐ Yes

                                                                       ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other      ☐ Yes
          court, including state court? (Companion cases are matters in which  ☒ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :